# **EXHIBIT 8**

1    <u>**DECLARATION OF JOHN D. O'CONNOR**</u>

2    I, John D. O'Connor hereby declare and state as follows:

3    **I.    <u>EDUCATION AND EXPERIENCE</u>**

4         1.    I am an attorney and licensed to practice law in all courts in the State of

5    California and have been so licensed since December 1972.  I am currently the principal of

6    O'Connor and Associates, a law firm consisting of myself and three associates that specializes

7    in commercial litigation.  I have forty-seven years of significant trial experience, including

8    current jury trial experience.

9         2.    In addition to my litigation practice, I have been retained as an attorneys' fees

10   expert on approximately two hundred and fifty occasions and have served as a consulting

11   expert on many more occasions.

12        3.    My *Curriculum Vitae* is attached hereto as **Exhibit A**.

13              **Education and Brief Summary of Work Experience**

14        4.    I attended The University of Notre Dame in South Bend, Indiana, where I

15   graduated *magna cum laude* in 1968. In 1972, I graduated *cum laude* from the University of

16   Michigan Law School, where I was a member of the *Order of the Coif* and Associate Editor of

17   the Michigan Law Review.  I was admitted to the California bar in 1972.

18        5.    After being admitted to the California bar, I held numerous positions at private

19   law firms where my practice focused on trial litigation.  In 1972 and 1973, I was an associate

20   with the trial firm of Belli, Ashe, and Choulos, where I assisted Mr. Melvin Belli in the trial of

21   several large cases and tried three cases on my own.  From January 1974 through December

22   1979, I was an Assistant United States Attorney for the Northern District of California in San

23   Francisco.  That capacity, I tried white-collar criminal cases as well as a variety of civil

24   matters.  Much of my civil work with the U.S. Attorney's office involved large claims brought

25   against the government, including one class action, energy pricing and regulatory disputes, and

26   a variety of tort claims.  In 1980 and 1981, I was a senior associate at the prominent San

27   Francisco firm of Brobeck, Phleger, and Harrison.

28        6.    From 1982 through 2001, I was a principal and managing partner of the law firm

of Tarkington, O'Connor & O'Neill, where our clients were mainly insurance companies, self-insured entities, corporate risk management departments, numerous local governmental entities, and federal entities such as the FDIC, FSLIC, RTC, NCUA, and the United States government.

7.     From 2001 through 2006, I was Special Counsel and a Director (equivalent in a legal corporation to a partner) for the Howard Rice firm, now merged with Arnold and Porter. At Howard Rice, I pursued a high-stakes litigation practice, including defense of R. J. Reynolds Tobacco Company, intellectual property disputes, and financial/professional services litigation.

8.     In late 2006, I formed O'Connor and Associates, a litigation boutique firm engaging in both business and tort litigation, as well as expert work in attorney fee analysis.

**Experience in Attorney Fee Analysis**

9.     In 1977, I began evaluating and litigating fee petitions filed against the United States government and its agencies.  In 1982, I began managing the Tarkington office and as our firm quickly grew to over eighty lawyers, I regularly kept abreast of billing standards in the community, and regularly subscribed to specialized publications geared to law firm management, such as the Altman and Weil annual reports and the monthly published Partners' Report.  I also regularly reviewed more widely published legal periodicals.

10.     As written billing guidelines became in vogue for institutional clients in the mid-eighties, I participated heavily in working with our institutional clients in government, insurance, and other large businesses to establish and implement practical billing standards.  I regularly consulted with these clients about their perception of the positive and negative in our billings, and where appropriate, remedied the same.

11.     I have kept abreast of the billing rates in the Bay Area, California, and generally throughout the country since 1982 when I managed the Tarkington firm.   Because we represented clientele in different business and governmental sectors, it was important for me to be conversant about rates throughout the litigation field ranging from premium to lower, more commoditized rates.

12.     Because our practice at the Tarkington firm often involved coverage, legal malpractice, and reinsurance and excess monitoring work, we reviewed the billings of a wide

variety of firms in our regular practice, including premium-rate billings, lower, highly negotiated insurance defense charges, and standard business litigation charges with rates falling between these two groups.

13.     My involvement in legal fee dispute work increased significantly in 1989. In that year, I was the Tarkington partner in charge of our work with failed and failing financial institutions on behalf of the FDIC, FSLIC, RTC, and NCUA. At that time, we had performed extensive work in connection with the failed Golden Valley Bank, Turlock, California, then in Receivership under the aegis of the FDIC. The insurance carrier for the bank insisted that we advise the government to release the insurance carrier from its defense obligations with a nominal payment. After our refusal, the insurance company subjected the Receiver and our firm to numerous audits in an unsuccessful attempt to force the government to release the carrier from its obligations. At this point I necessarily became immersed in the various billing standards prevalent in the community.

14.     During these years of legal fee disputes, I spent the majority of my time dealing with the developing field of legal "auditing" and related litigation. As a result, I gained a wide knowledge of auditing practices, prevailing billing standards, and approaches employed by legal fee experts, auditors, and litigators.

15.     Due to my growing expertise in the legal fee and auditing issues, during the years 1991 through 2001, I consulted with numerous law firms throughout the country who were seeking my advice on audit criticisms leveled against their practices, almost invariably involved in large fee disputes. I also consulted on numerous occasions with fee payors in fee disputes. I continue this work as a subspecialty of my litigation practice through the present time.

16.     At Howard Rice (now merged into Arnold and Porter) from late 2001 through July 2006, we kept informed about both premium rates in the area and rates charged by the wider sector of more market-driven business firms, so that we could in turn appropriately set ours on an annual basis. Because we did work throughout California, our surveys involved both Northern California and Southern California, as well as national firm rates. At Howard Rice, I

1  served as a JAMS arbitrator in a multimillion-dollar asbestos litigation fee dispute involving

2  hundreds of cases defended under an insurance policy.

3      17.    I have been retained as an attorneys' fees expert on approximately two hundred

4  and fifty occasions and have served as a consulting expert on many more occasions.  I am

5  frequently tasked with analyzing reasonable rates in a contingent, fee shifting context, in order

6  to determine a reasonable fee award for a given case.  In addition, I have significant experience

7  dealing with complex attorneys' fees issues in other contexts, such as litigating fees in a number

8  of civil rights and other "fee shifting" cases, and being charged by the United States

9  government, as an Assistant U.S. Attorney, to assess and negotiate significant class counsel fees

10  for several different firms who had pursued and obtained a settlement in a very large, class

11  action labor discrimination case against the Naval Air Rework Facility in Alameda.

12      18.    In total, I have testified as an expert or handled litigations in approximately

13  twenty states.  I regularly review published rate surveys, generally broken down by location,

14  fields of practice, size of firm, and status of lawyer. For the past several years, I have also been

15  consulting and lecturing nationwide through the auspices of the National Association of Legal

16  Fee Analysis ("NALFA"). In addition to lecturing myself, I have attended numerous lectures of

17  legal fee analysts, expert witnesses, and general counsel on fee matters. I had the honor of being

18  named by NALFA the "nation's top attorney fee expert" from 2017 through 2019.

19      19.    My expert opinions on attorneys' fees frequently receive favorable treatment

20  from courts and arbitrators.  For example, in 2010, I was an attorneys' fees expert retained by

21  class counsel in *Duran v. U.S. Bank*, an employment class action case tried before Honorable

22  Robert J. Freedman, Alameda County Superior Court, in which class counsel was awarded

23  $18.8 million dollars.  Judge Freedman based certain findings favorable to class counsel on

24  "persuasive expert testimony expressed by John D. O'Connor." *Order Granting in Part and*

25  *Denying in Part Plaintiffs' Motion for Reasonable Attorneys' Fees, Duran*, No. 2011-035537

26  (Dec. 16, 2010), p. 30.

27      20.    I have over forty years of significant litigation experience in cases involving free

28  speech and the First Amendment, including numerous cases dealing with the tension between

1  private property rights and the right to express controversial beliefs and opinions representing

2  commercial property owners, as well as cases involving governmental restrictions, while

3  working on Civil Division cases for the U.S. Attorneys' Office.

4          21.     In the *Duran* case, Judge Freedman accepted my opinion of the applicable hourly

5  rates of Edward Wynn as being $640 per hour, noting in his opinion that he relied on the

6  undersigned for guidance in this regard:

> The Court finds that Plaintiffs have presented extensive evidence
> that the hourly rates their attorneys have requested are within the
> range of rates charged by and awarded to attorneys of comparable
> experience, reputation, and ability for comparably complex
> litigation. CHMC, 97 Cal.App.4th 740, 783. That evidence
> includes: ... *(5) persuasive expert testimony presented by Mr.*
> *John D. O'Connor... Based on the evidence before the Court*
> *including declarations submitted in support of Plaintiffs' Motion*,
> the Court finds that Mr. Wynne is highly regarded among his
> peers for his skill, experience, and tenacity. The Court finds that
> given Mr. Wynne's experience, demonstrated skill, and reputation,
> his $640 hourly rate is well within the range of rates charged by
> and awarded to similarly experienced and qualified attorneys in
> this area. (Emphasis added. December 12, 2010 Order, pp 26-27).
> In marked contrast to the Court's findings with respect to Mr.
> Schratz, the Court finds Mr. O' Connor's declaration to be
> considerably more persuasive in assessing the relevant issues
> before this Court. The Court finds Mr. O'Connor's opinions
> related to the lodestar analysis to be useful, insightful and well-
> reasoned.

19  (Duran, et al. v. U.S. Bank Nat'l Ass'n, Sup. Ct. Cal., Alameda Cty., Case No. 2001-035537

20  (Dec. 16, 2010, p. 26-27, 30).)

21          22.     I previously testified in a trial in San Francisco Superior Court, *J.R. Marketing,*

22  *L.L.C. v. Hartford Casualty Ins. Co.*, Case No. CGC-06-449220, and was accepted as a

23  qualified expert by Judge Lynn O'Malley Taylor.  In that case, I testified regarding $12,000,000

24  in legal fee billings allegedly payable by an insurer for defense work by a national law firm. I

25  also previously testified by Declaration in U.S. District Court for the Northern District of

26  California in *Moore v. Verizon*, Case No. 09-1823 SBA (JSC), and *U.S. v. Nosal*, Case No.

27  3:08-CR-00237-EMC.

28          23.     I am familiar with the ADA statutory scheme and attorney fee incentives.  I

1    defended an ADA disability discrimination case to a jury in 2000, which the plaintiff won, and I

2    agreed to pay significantly higher fees, approximately $500 per hour, to the firm of Dickson

3    Ross.  Additionally, I have given attorney fee opinions in approximately ten ADA cases, and

4    keep current on developments in this area.

5         24.    Based upon the foregoing, I believe I am qualified to opine on the rates

6    applicable in this case.

7    **II.    SUMMARY OF OPINIONS**

8         25.    The range of rates which should be applied to the attorneys working on this case

9    range from $410 per hour for certain associates to $650 per hour for partner-level attorneys.

10        26.    "In the Bay Area, 'reasonable hourly rates for partners range from $560 to $800,

11   for associates from $285 to $510, and for paralegals and litigation support staff from $150 to

12   $240.'" (*Shaw v. Five M, LLC* (N.D.Cal. Feb. 27, 2017) No. 16-cv-03955-BLF, 2017 U.S. Dist.

13   LEXIS 27348, at *12-13 (citing *In re LinkedIn User Privacy Litig.,* (N.D. Cal. 2015) 309 F.R.D.

14   573, 591-92.))

15        27.    Based upon a variety of factors, I opine that the most appropriate rate for

16   partners' ADA services range from $450 to $750 per hour, despite recent awards as low as $400

17   to $425. The range of requested hourly rates of $500 to $650 for partners sought here is clearly

18   reasonable.  I opine that the most appropriate range for associates' services range from $300 to

19   $550 per hour, notwithstanding exceptional awards as low as $250.  The hourly rates of $410

20   and $500 for associates sought here represents the median range of rates, below premium rates,

21   and above the lowest level.

22   **III.    DISCUSSION**

23        28.    I have been asked to evaluate the rates requested herein by Mr. Johnson's

24   counsel and provide my opinion regarding the reasonableness of same.

25        29.    Consequently, I have reviewed the motions filed herein, recent rates awarded in

26   the Northern District, and disability billing rates in the Bay Area in general; as noted above I

27   have kept abreast of these rates since at least 2000.

28   / / /

1    **Plaintiff's Counsel's Experience**

2        30.    I now briefly recite Plaintiff's counsel's experience, although I note that a more

3    complete recitation of counsel's experience is included in Mr. Potter's Declaration:

4        a.    Mark Potter, barred in 1993, has 26 years of experience, the last 20 of which

5            were devoted to disability litigation, has litigated over 2,000 disability cases,

6            has appeared on the news as an ADA legal expert, and is widely regarded as

7            an authority in this area of law;

8        b.    Russell Handy, barred in 1998, has 21 years of experience, the last 19 of

9            which were devoted to disability litigation, and has litigated in excess of

10           1,000 ADA cases;

11       c.    Phyl Grace, barred in 1994, has 25 years of experience, the last 10 of which

12           were devoted to disability litigation;

13       d.    Mary Melton, barred in 1993, has 26 years of experience and has handled

14           hundreds of disability cases;

15       e.    Dennis Price, barred in 2011, has 8 years of experience, the last 7 of which

16           were devoted to disability litigation, has been involved in hundreds of

17           disability cases;

18       f.    Chris Carson, also barred in 2011, has 8 years of experience, more than the

19           last 5 of which have been devoted to disability litigation;

20       g.    Amanda Seabock, barred in 2013, with 6 years of experience, has devoted

21           her entire legal career to disability access, joining Potter Handy in 2012 first

22           as an intern and then as an attorney;

23       h.    Elliott Montgomery, barred in 2011, has 8 years of experience

24       i.    Sara Gunderson, barred in 2015, has 4 years of experience, the last two of

25           which were devoted to disability litigation;

26       j.    Bradley Smith, barred in 2014, has 5 years of experience, the last year of

27           which has been devoted to disability litigation;

28       k.    Prathima Reddy Price, barred in New York in 2005 and California in 2018,

1    has over 14 years of experience;

2        l.    Farrell Goodman, originally barred in 1985 and reactivated his license in

3            2015, has 9 years of experience; and

4        m.    Jennifer McAllister, barred in 2012, has 7 years of experience.

5                              **Northern District ADA Fee Awards**

6        31.    The first step in the determination of a lodestar figure is to determine the

7    reasonable hourly rate to be applied. A court awarding attorney fees must look to the prevailing

8    market rates in the relevant legal community.  (*See Blum v. Stenson* (1984) 465 U.S. 886, 895.)

9    Here, the relevant legal community is the Northern District of California, located in the San

10   Francisco Bay Area.  As such, the applicable rates would be those charged by disability

11   attorneys in the San Francisco, Oakland, and San Jose communities.

12       32.    I begin with reasonable rates billed in the San Francisco Bay Area.  As stated

13   above, in 2017, the *Shaw* Court found that partner rates range from $560 to $800, associate rates

14   range from $285 to $510, and paralegal and litigation support staff rates range from $150 to

15   $240.  I generally agree with the ranges of rates provided in *Shaw*, but note that there is slightly

16   more variance in partner rates depending on practice area.  Premium hourly rates exceeding

17   $1,000 for partners, and partner rates for highly commoditized work generally fall well below

18   $560, in some practice areas as low as $300 to $400 per hour..

19       33.    As stated above, I opine that a reasonable partner ADA rate ranges from $450 to

20   $750 per hour. The range of requested hourly rates of $500 to $650 for partners sought here is

21   therefore reasonable.  I opine that the most appropriate range for associate services range from

22   $350 to $550 per hour.  The hourly rates of $410 and $500 for associates sought here are

23   therefore reasonable.

24       34.    My opinion is bolstered by recent fee awards for ADA cases venued in the

25   Northern District of California and discussed below.

26       35.    In *Rodriguez v. Barrita, Inc.* (N.D. Cal. 2014) 53 F. Supp. 3d 1268, the court

27   awarded Ms. McGuinness, then a twenty-two year attorney, an hourly rate of $550, despite

28   recent rulings awarding an hourly rate of $495 less than one year prior to the *Rodriguez* fee

1  award.  The *Rodriguez* court also awarded Mr. Rein, an attorney with over forty-five years of

2  experience, an hourly rate of $645, and Ms. Cabalo, an associate with seven years of

3  experience, an hourly rate of $425.

4      36.     In *Martin v. Diva Hosp. Grp., Inc.* (N.D. Cal. Dec. 7, 2018) No. 16-cv-04103-

5  EDL, 2018 U.S. Dist. LEXIS 217004, the court found that a reasonable hourly rate for Ms.

6  McGuinness of $700, even though the *Rodriguez* court found that $550 was a reasonable rate

7  four years earlier.  The *Martin* court found Mr. Rein's reasonable hourly rate to be $795, even

8  though the *Rodriguez* court found his reasonable hourly rate to be $645.  The *Martin* court also

9  found that a reasonable hourly rate for Mr. Derby, then a twenty-eight year attorney, was $700,

10  and the reasonable hourly rate for Mr. Clefton, a paralegal who later was sworn into the bar in

11  December 2017, was $200 for his work as a paralegal and $375 *as a first-year associate*.

12      37.     In *Rodgers v. Claim Jumper Rest., LLC*, (N.D. Cal. Apr. 24, 2015), No. 13-CV-

13  5496-YGR, 2015 U.S. Dist. LEXIS 54164, the found that a reasonable hourly rate for Mr.

14  Gong, then an attorney with 19.5 years of experience with 8 years of ADA experience trying

15  75-85 ADA claims, was $525. The *Rodgers* court found that "courts in the Northern District

16  have found that rates between $450 and $650 per hour represent reasonable rates for attorneys

17  with skill, experience and reputation similar to Mr. Gong." (*Rodgers v. Claim Jumper Rest.,*

18  *LLC* (N.D. Cal. Apr. 24, 2015) No. 13-CV-5496-YGR, 2015 U.S. Dist. LEXIS 54164, at *12-

19  13.)

20      38.     Mr. Gong was then awarded an hourly rate of $650 in *Dytch v. Lazy Dog Rests.*,

21  LLC (N.D. Cal. Aug. 16, 2019) No. 16-cv-03358-EDL, 2019 U.S. Dist. LEXIS 143298, noting

22  that the *Rodgers* court found Mr. Gong's reasonable rate to be $525 four years earlier, but

23  finding that the rate increase was reasonable as Mr. Gong had not increased rates since *Rodgers*.

24      39.     In *Shaw*, decided in February 2017, the Court found that a reasonable hourly rate

25  for Mr. Potter, then an attorney with 24 years of experience, to be $425. (*See Shaw*, 2017 U.S.

26  Dist. LEXIS 27348, at *12.)

27      40.     In *Love v. Rivendell II, LTD.* (N.D. Cal. Mar. 11, 2019) No. 18-cv-03907-EDL,

28  this District evaluated the reasonable rates of many of the timekeepers involved in the instant

litigation.  In *Love*, Mr. Potter, Mr. Handy, and Ms. Grace requested an hourly rate of $650, and Ms. Carson, Mr. Price, and Mr. Goodman requested an hourly rate of $410.  In her Report and Recommendation Regarding Plaintiff's Motion for Default Judgment, Magistrate Judge Elizabeth D. Laport found, "[t]hese requested rates are consistent with the hourly rates that have been approved for attorneys with similar experience and qualifications." (Dkt. No. 25 at 9-10:26-20).  In his Order Adopting Magistrate Judge's Report and Recommendation (Dkt. No. 30), Judge Jon S. Tigar found "the report correct, well-reasoned, and thorough," and adopted "it in every respect." (Dkt. No. 30 at 1:18-19).  As such, this district has already found that a reasonable hourly rate for Mr. Potter, Mr. Handy, Ms. Grace to be $650, and a reasonable hourly rate for Ms. Carson, Mr. Price, and Mr. Goodman to be $410.

41.    Despite the findings in *Love*, this District subsequently awarded rates lower than those awarded in Love.  First, in *Johnson v. Autozone, Inc.*, (N.D. Cal. May 29, 2019) No. 17-cv-02941-PJH, 2019 U.S. Dist. LEXIS 90116, the court, per Hon. Phyllis J. Hamilton, found that the following were the reasonable hourly rates for plaintiff's counsel: $425 for Mr. Potter, Mr. Handy, and Ms. Grace; $300 for Ms. Melton, Mr. Price, Ms. Masanque, Ms. Carson, and Ms. Lockhart; and $250 for Ms. Gunderson, Mr. Montgomery, and Mr. Smith. Then, in *Gonzalez v. Machado*, (N.D. Cal. July 10, 2019) No. 17-cv-02203-LB, 2019 U.S. Dist. LEXIS 114820, the court, citing *Johnson v. Autozone*, found:

> The court reduces the hourly rate for Mark Potter, Russell Handy, and Phyl Grace from $650 to $425, which is the rate awarded by other courts in this district. In a recent Northern District case involving the lack of accessible parking, the court — invoking other cases — awarded each $425 per hour. *See Johnson v. Autozone, Inc.*, No. 17-cv-02941-PJH, 2019 U.S. Dist. LEXIS 90116, 2019 WL 2288111, at *6 (N.D. Cal. May 29, 2019) (collecting cases).
>
> The court reduces the hourly rate for Mary Melton, Dennis Price, Isabel Masanque, Chris Carson, Amanda Seabock, and Khushpreet Mehton from $500 to $300, again following *Johnson v. Autozone*. 2019 U.S. Dist. LEXIS 90116, [WL] at *7 (collecting cases and [*12] analyzing fee awards).

> The court reduces the hourly rate for Sara Gunderson, Farrell Goodman, and Prathima Reddy Price from $410 to $250. *See id.* (collecting cases and awarding a $250 hourly rate for junior attorneys, including Ms. Gunderson).

*Gonzalez v. Machado* at *11-12.  As such, the *Gonzalez* Order, plainly states that the court relied on the findings in *Johnson v. Autozone* in determining reasonable hourly rates, which in my opinion are below the median.

42.    While I afford great deference to the Court, I must point out inconsistencies with the rates awarded in *Johnson v. Autozone* and *Gonzalez v. Machado*, compared to those awarded in other attorneys litigating Northern District ADA cases.

a.    Ms. McGuinness, barred in 1992 with 22 years of experience, of which no more than 16 years were devoted to disability litigation, was awarded an hourly rate of $550 in 2014, despite being awarded $495 seven months prior. Then, in 2018, Ms. McGuiness was awarded an hourly rate of $700. However, Mr. Potter, barred in 1994 with the last 20 years of his practice devoted to disability issues, Mr. Handy, barred in 1998 with the last 19 years of his practice devoted to disability litigation, and Ms. Grace, barred in 1994 with the last 10 years of her practice devoted to disability issues were awarded $425 in 2019, despite having similar experience as Ms. McGuinness ($550 in 2014).  I further note that the court awarded Ms. McGuinness a $55 increase in her reasonable hourly rate after only seven months and then awarded another rate increase of $150 four years later.  This contrasts greatly with the *Autozone* and *Gonzalez* awards, which refused to grant any rate increase for Mr. Potter from his 2017 award in *Shaw*, and actually reduced all rates from *Love*, which was decided months prior to *Autozone*.

b.    Ms. Cabalo, barred in 2007 with 7 years of experience, of which the last 5 were devoted to disability litigation, was awarded an hourly rate of $425 in July 2014.  I note that this is the same rate awarded to Mr. Potter, Mr. Handy, and Ms. Grace, five years later, even though they have far greater experience than Ms. Cabalo had in 2014.

c.  Mr. Gong, barred in 1995 with 19.5 years of experience, including 8 years of
ADA experience trying 75-85 cases, was awarded $525 per hour in April
2015. Again, Mr. Potter, Mr. Handy, and Ms. Grace, were all awarded an
hourly rate of $425 over four years later, despite having similar overall
experience and far greater ADA experience than Mr. Gong.  I further note
that Mr. Gong, despite having been awarded $525 in 2015, was awarded an
hourly rate of $650 in August 2019.  Conversely, Mr. Potter was awarded
$425 in *Shaw* in 2017, and had his rates cut from *Love* to bring Mr. Potter's
rate back to $425, his reasonable rate in 2017.

d.  In 2018, Mr. Clefton, first a paralegal who was awarded an hourly rate of
$200 for paralegal work, was also awarded an hourly rate of $375 for his
work following his admission to the California bar.  In other words, Mr.
Clefton rate increased $175 merely for passing the bar.  However, between
five and seven months later, Potter Handy partners were awarded an hourly
rate of only $425, junior partners/senior associates were awarded an hourly
rate of only $300, and associates were awarded an hourly rate of $250,
despite all Potter Handy timekeepers having substantially more experience
than Mr. Clefton.

43.    I opine that the *Autozone* and the *Gonzalez* courts awarded unreasonably low
rates, below the median, in light of the *Love* award and other recent fee awards, including those
identified above.  Whenever I suspect that attorneys have been awarded unreasonable low rates
by a court, I will compare the rate awarded to the rate under the *Laffey* Matrix.  In fact, the
Northern District, in *Chapman v. NJ Props.*, applied the same approach when evaluated whether
an attorney's rate increase was appropriate. (*See Chapman v. NJ Props.* (N.D. Cal. Aug. 7,
2019) No. 5:16-cv-02893-EJD, 2019 U.S. Dist. LEXIS 132908, at *12 ["Nevertheless, the court
recognizes that the market rates for legal services in general have increased in the past several
years according to the Laffey Matrix."].)

/ / /

1

*Laffey* **Matrix**

2        44.    The Laffey Matrix was developed in the case of *Laffey v. Northwest Airlines,*

3  *Inc.* (D.D.C. 1983) 572 F.Supp. 354, 371, in the District Court for the District of Columbia,

4  precisely for the purpose of determining reasonable fees in cases where an appropriate billable

5  rate needed to be determined.  The Department of Justice in Washington, D.C. maintains a

6  *Laffey* Matrix which adjusts the fees on the *Laffey* case based upon the general inflation rate.

7        45.    Because of the difference in inflation rates, the rate applicable for a lawyer of

8  twenty years experience, such as the billing partners in this case, varies significantly from one

9  matrix to the other.

10        46.    In my opinion, the more senior partners' services are appropriately recompensed

11  under the 2019 DOJ *Laffey* Matrix, for a fee of approximately $595 per hour for an attorney

12  with 21-30 years of experience, $566 for an attorney with 16-20 years of experience, $510 for

13  an attorney with 11-15 years of experience, $433 for an attorney with 8-10 years of experience,

14  $372 for an attorney with 6-7 years of experience, $365 for an attorney with 4-5 years of

15  experience. *See* **Exhibit B**.

16        47.    In accordance with *In re Chiron, supra*, and *In re HPL Techs., Inc., Secs. Litig.*

17  366 F. Supp. 2d 912, 921-22 (N.D. Cal. 2005), however, this rate should be adjusted to reflect

18  the cost of living in San Francisco Bay Area as opposed to that of Washington, D.C.  To make

19  this adjustment, I have relied on the 2019 federal locality pay differentials based on federally

20  compiled cost of living data. The 2019 federal locality pay differentials may be found at

21  https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2019/general-schedule/.

22  The 2019 pay tables show that the Washington-Baltimore area has a +29.32% locality pay

23  differential, while the San Francisco Bay Area has a differential of +40.35%. Applying the *In re*

24  *HPL* formula, the appropriate rate for Sacramento is +8.53%.  Thus, the cost of living

25  adjustment to the $595 Laffey matrix figure yields an hourly rate of approximately $646 per

26  hour, the $566 Laffey matrix figure yields an hourly rate of approximately $614, the $510

27  Laffey matrix figure yields an hourly rate of approximately $553, the $433 Laffey matrix figure

28  yields an hourly rate of approximately $470, the $372 Laffey matrix figure yields an hourly rate

1  of approximately $404, the $365 Laffey matrix figure yields an hourly rate of approximately

2  $396. *See* **Exhibit C**. These rates are quite comparable with the rates of Jackson Lewis and

3  Littler Mendelson, both prominent ADA defense firms.

4      48.     This Laffey Matrix provides a good estimate of the generally prevailing rates in

5  the community for established, reputable firms of good skill, which then can be adjusted for

6  cost of living differentials in various legal markets throughout the country.  (*See In re Chiron*

7  *Corp. Sec. Litig.* (N.D. Cal. Nov. 30, 2007) 2007 WL 4249902,; *In re HPL Techs., Inc., Secs.*

8  *Litig.* (N.D. Cal. 2005) 366 F. Supp. 2d 912, 921-22.)

9      49.     I believe that the DOJ Laffey Matrix is an excellent tool for determining

10  reasonable rates for excellent firms throughout the country, and serves as an effective reference

11  point when evaluating the reasonableness of an hourly rate awarded.

12      50.     This matrix does not in this form reflect premium rates – that is, those above the

13  prevalent reasonable rates charged throughout the legal market for established, reputable firms.

14      51.     There are some highly complex cases where it is appropriate to charge premium

15  rates, as well as instances where an unusually highly skilled lawyer merits these fees in an

16  appropriate case calling for such skill.

17      52.     In any case, the DOJ Laffey Matrix rates are often applied in cases where the

18  client is not actually paying fees, and this Matrix applies the prevailing fees. Consider the *In re*

19  *Chiron* case, (N.D. Cal. Nov. 30, 2007) 2007 WL 4249902, where Judge Vaughn Walker of the

20  Northern District of California used this DOJ Laffey Matrix in setting counsel's fees in a class

21  action.

22

23

24

25

26

27

28  / / /

**Recommended Rates**

53.     In light of the foregoing, I opine that a reasonable hourly rates are as follows:

     a.  $650 for Mr. Potter, Mr. Russell, and Ms. Grace, consistent with the rate awarded in *Love*;

     b.  $500 for Ms. Melton, Mr. Price, Ms. Carson, and Ms. Seabock;

     c.  $410 for Mr. Montgomery, Ms. Gunderson, Mr. Bradley, Ms. Price, Mr. Goodman, and Ms. McAllister.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of October 2019 in San Francisco, California.

JOHN D. O'CONNOR

# Exhibit A



201 Mission Street, Suite 710 - San Francisco, CA 94105
T: 415-693-9960 / F: 415-692-6537 / www.joclaw.com



**JOHN D. O'CONNOR**
**201 Mission Street, Suite 710**
**San Francisco, CA 94105**
**Phone:   415-693-9960**
**Direct:   415-464-6250**
**Mobile: 415-999-2528**
**john@joclaw.com**

### *CURRICULUM VITAE*

**Education**

University of Michigan Law School, *cum laude* – Juris Doctorate, 1972

- Member, Michigan Law Review (1970-1972), Associate Editor (1971-1972)
- Member, *Order of the Coif* (1971-72)
- Winner of three AmJur awards as the most outstanding student in a subject.

University of Notre Dame, *magna cum laude* – A.B., 1968

**Work Experience**

Associate, Belli, Ashe & Choulos – 1972-1973

- Dealt mainly with assessing and negotiating "splits" with other attorneys of contingency fees

U.S. Attorney's Office, Civil Division – 1977-1979

- Dealt with attorneys fees, "fee-shifting" civil rights cases; assessed, negotiated, and litigated attorneys fees in both individual cases and class action cases; litigated Saunders v. NARF in the 9th Circuit

Senior Associate, Brobeck Phleger and Harrison – 1980-1981

- Working for prestigious litigation firm, learned staffing and billing procedures and protocols for large commercial cases

Managing Partner, Tarkington, O'Connor and O'Neill – 1982-2000

- Managing partner responsible for all firm billings

- Supervised billing seminars for newly graduated and recently hired lawyers within firm
- Kept current both with hourly fees charged in the community and billing protocols for various firms and cases throughout the area
- Subscribed to various periodicals such as <u>Partners Report</u> and <u>Altman & Weil</u> annual reports (Altman & Weil is a nationally known law firm consultant organization)
- Consulted with insurance executives regarding billing procedures for their companies
- Consulted with insurance claims executives regarding CUMIS issues including billing rates for various types of litigation throughout the Bay Area
- Worked with various government agencies, such as FDIC, FLIC, NCUA, and RTC regarding appropriate billing protocols, and discussed bills with government officials regarding compliance; Dealt with governmental auditors regarding same
- Consulted with insurance executives regarding CUMIS issues; was resource for those executives negotiating CUMIS fees with independent counsel
- Represented numerous entities including governmental entities, in attorneys fees litigation (e.g. in the Sonoma County jail class action litigation, litigated the fees of Heller Ehrman in a fee-shifting civil rights context)
- Defended legal malpractice cases and examined legal malpractice and other professional liability cases for clients, including the conservators and receivers of failed and failing financial institutions
- Interacted with legal counsel and claims executives for governmental and insurance clients in review and analysis of firm billings
- Dealt with <u>Brandt</u> fee issues both as a plaintiff and defendant in insurance coverage cases
- From time to time reviewed bills of firms in underlying cases while representing insurers, reinsurers and access carriers
- Significant work regarding legal fee auditing and litigation regarding legal fees and legal fee auditing, detailed below

Director (Partner) and Special Counsel, Howard Rice – 2001-2006
- Regularly apprised of market rates of competing law firms, as firm annually reset its rates
- Acquired knowledge of total fees charged on various complex cases, both by the Howard Rice firm and others

- Named arbitrator on 3-arbitrator JAMS panel regarding over $2,000,000 of asbestos billings; heard and evaluated testimony of competing fee experts and auditors

Principal, O'Connor and Associates – 2006-Present
- Expert witness and consultant, legal fees and litigation management
- Member, National Association of Legal Fee Analysis

**Overview of Services**

John D. O'Connor offers expert consultant services in a variety of attorney fee and litigation management contexts. He is regularly employed as both an expert and litigator in attorney fee disputes, confidential consultation. His services often involve an analysis of the skill and efficiency of attorneys in litigation and litigation management.

**Background and Qualifications**

John O'Connor has over 40 years of experience in a wide variety of litigation matters, ranging from personal injury to civil rights and employment to complex business cases. A significant part of that experience is the trial of over 70 cases in both state and federal Courts throughout the country, and the preparation for and settlement of many more. Additionally, for 20 years, O'Connor functioned as managing partner of a substantial litigation firm. His law firm experience includes partnerships in small boutique firms, a substantial mid-sized firm, and larger nationally known firms.

A significant portion of his work for over 35 years has been the evaluation, litigation and resolution of attorney fee issues. First as an Assistant United States Attorney, and later representing county and municipal governments, O'Connor has represented potential fee payors under "fee shifting" statutes.

As a private lawyer for federal government agencies during the financial institutions crises of the 1980's and 90's, and as well working with a variety of insurers and self-insurers, O'Connor has worked to develop with the client, and implement on behalf of his law firm, sophisticated billing guidelines. O'Connor has worked with many clients in mutually cooperative fashion to examine firm billings, assure compliance and rectify short comings.

Since the advent in the late 1980's of adversarial legal auditing, O'Connor has served extensively as both an expert and litigator analyzing audit criticisms, applying community standards, and construing applicable case law. In this context, O'Connor has consulted on hundreds of adversarial legal fee disputes over three decades. He has as well served as JAMS mediator, a litigator representing both law firms and fee payors on fee issues, and an expert witness both through written Declaration and oral testimony.

# Exhibit B

# USAO ATTORNEY'S FEES MATRIX — 2015-2020

*Revised Methodology starting with 2015-2016 Year*

Years (Hourly Rate for June 1 – May 31, based on change in PPI-OL since January 2011)

| Experience | 2015-16 | 2016-17 | 2017-18 | 2018-19 | 2019-20 |
|---|---|---|---|---|---|
| 31+ years | 568 | 581 | 602 | 613 | 637 |
| 21-30 years | 530 | 543 | 563 | 572 | 595 |
| 16-20 years | 504 | 516 | 536 | 544 | 566 |
| 11-15 years | 455 | 465 | 483 | 491 | 510 |
| 8-10 years | 386 | 395 | 410 | 417 | 433 |
| 6-7 years | 332 | 339 | 352 | 358 | 372 |
| 4-5 years | 325 | 332 | 346 | 351 | 365 |
| 2-3 years | 315 | 322 | 334 | 340 | 353 |
| Less than 2 years | 284 | 291 | 302 | 307 | 319 |
| Paralegals & Law Clerks | 154 | 157 | 164 | 166 | 173 |

*Explanatory Notes*

1.  This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia (USAO) to evaluate requests for attorney's fees in civil cases in District of Columbia courts.  The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees.  *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b) (Equal Access to Justice Act).  The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, or by other Department of Justice components, or in other kinds of cases.  The matrix does **not** apply to cases in which the hourly rate is limited by statute.  *See* 28 U.S.C. § 2412(d).

2.  A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases.  *See, e.g., Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010).  Consistent with that definition, the hourly rates in the above matrix were calculated from average hourly rates reported in 2011 survey data for the D.C. metropolitan area, which rates were adjusted for inflation with the Producer Price Index-Office of Lawyers (PPI-OL) index.  The survey data comes from ALM Legal Intelligence's 2010 & 2011 Survey of Law Firm Economics.  The PPI-OL index is available at http://www.bls.gov/ppi.  On that page, under "PPI Databases," and "Industry Data (Producer Price Index - PPI)," select either "one screen" or "multi-screen" and in the resulting window use "industry code" 541110 for "Offices of Lawyers" and "product code" 541110541110 for "Offices of Lawyers."  The average hourly rates from the 2011 survey data are multiplied by the PPI-OL index for May in the year of  the update, divided by 176.6, which is the PPI-OL index for January 2011, the month of the survey data, and then rounding to the nearest whole dollar (up if remainder is 50¢ or more).

3.  The PPI-OL index has been adopted as the inflator for hourly rates because it better reflects the mix of legal services that law firms collectively offer, as opposed to the legal services that typical consumers use, which is what the CPI-

Legal Services index measures. Although it is a national index, and not a local one, *cf. Eley v. District of Columbia*, 793 F.3d 97, 102 (D.C. Cir. 2015) (noting criticism of national inflation index), the PPI-OL index has historically been generous relative to other possibly applicable inflation indexes, and so its use should minimize disputes about whether the inflator is sufficient.

4.  The methodology used to compute the rates in this matrix replaces that used prior to 2015, which started with the matrix of hourly rates developed in *Laffey v. Northwest Airlines, Inc.* 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985), and then adjusted those rates based on the Consumer Price Index for All Urban Consumers (CPI-U) for the Washington-Baltimore (DC-MD-VA-WV) area. The USAO rates for years prior to and including 2014-15 remains the same as previously published on the USAO's public website.

5.  The various "brackets" in the column headed "Experience" refer to the attorney's years of experience practicing law. Normally, an attorney's experience will be calculated starting from the attorney's graduation from law school. Thus, the "Less than 2 years" bracket is generally applicable to attorneys in their first and second years after graduation from law school, and the "2-3 years" bracket generally becomes applicable on the second anniversary of the attorney's graduation (*i.e.*, at the beginning of the third year following law school). *See Laffey*, 572 F. Supp. at 371. An adjustment may be necessary, however, if the attorney's admission to the bar was significantly delayed or the attorney did not otherwise follow a typical career progression. *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate); *EPIC v. Dep't of Homeland Sec.*, 982 F. Supp. 2d 56, 60-61 (D.D.C. 2013) (same). The various experience levels were selected by relying on the levels in the ALM Legal Intelligence 2011 survey data. Although finer gradations in experience level might yield different estimates of market rates, it is important to have statistically sufficient sample sizes for each experience level. The experience categories in the current USAO Matrix are based on statistically significant sample sizes for each experience level.

6.  ALM Legal Intelligence's 2011 survey data does not include rates for paralegals and law clerks. Unless and until reliable survey data about actual paralegal/law clerk rates in the D.C. metropolitan area become available, the USAO will compute the hourly rate for Paralegals & Law Clerks using the most recent historical rate from the USAO's former *Laffey* Matrix (*i.e.*, $150 for 2014-15) updated with the PPI-OL index. The formula is $150 multiplied by the PPI-OL index for May in the year of the update, divided by 194.3 (the PPI-OL index for May 2014), and then rounding to the nearest whole dollar (up if remainder is 50¢ or more).

7.  The attorney's fees matrices issued by the United States Attorney's Office are intended to facilitate the settlement of attorney's fees claims in actions in which the United States may be liable to pay attorney's fees to the prevailing party and the United States Attorney's Office is handling the matter. The United States Attorney's Office is presently working with other parties to develop a revised rate schedule, based upon current, realized rates paid to attorneys handling complex federal litigation in the District of Columbia federal courts. This effort is motivated in part by the D.C. Circuit's urging that "both the plaintiff and defense sides of the bar" should "work together and think creatively about how to produce a reliable assessment of fees charged for complex federal litigation in the District." *D.L. v. District of Columbia*, 924 F.3d 585, 595 (D.C. Cir. 2019). This new matrix should address the issues identified by the majority in *D.L.*, but it is expected that it will be some time before a new matrix can be prepared. In the interim, for matters in which a prevailing party agrees to payment pursuant to the matrices issued by the United States Attorney's Office, the United States Attorney's Office will not demand that a prevailing party offer the additional evidence that the law otherwise requires. *See Eley*, 793 F.3d at 104 (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995)) (requiring "evidence that [the] 'requested rates are in line with those prevailing in the community for *similar services*'").

# Exhibit C

| Exhibit C: Adjustments to Laffey Matrix for the San Francisco Bay Area | | | |
|---|---|---|---|
| **Experience** | **2019-2020 D.C. Rates** | **2019-2020 S.F. Rates** | **Potter Handy Timekeepers** |
| 31+ years | $637 | $691 | |
| 21-30 years | $595 | $646 | Mr. Potter, Mr. Handy, Ms. Grace, Ms. Melton |
| 16-20 years | $566 | $614 | |
| 11-15 years | $510 | $554 | Ms. Price |
| 8-10 years | $433 | $470 | Mr. Price, Ms. Carson, Mr. Montgomery, Mr. Goodman |
| 6-7 years | $372 | $404 | Ms. Seabock, Ms. McAllister |
| 4-5 years | $365 | $396 | Ms. Gunderson, Mr. Smith, |
| 2-3 years | $353 | $383 | |
| Less than 2 years | $319 | $346 | |
| Paralegals and Law Clerks | $173 | $188 | |